THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing: August 11, 2022                         Mailed: January 4, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

Trademark Trial and Appeal Board
————

*In re NextGen Management, LLC*
————

Serial No. 88098031
————

Stephen J. Driscoll, of FisherBroyles LLP,
    for NextGen Management, LLC.

Lyal Fox, Trademark Examining Attorney, Law Office 113,
    Myriah Habeeb, Managing Attorney.

————

Before Wolfson, Goodman, and Johnson, Administrative Trademark Judges.

Opinion by Wolfson, Administrative Trademark Judge:

NextGen Management, LLC ("Applicant") seeks registration on the Principal Register of the term DXPORTAL (in standard characters) for services ultimately defined as "Providing an Internet website portal in the healthcare field to provide a patient and caregivers with the patient's drug prescription information," in International Class 44.[1]

---

[1] Application Serial No. 88098031 was filed on August 29, 2018, under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based upon Applicant's assertion of a bona fide intent to use the mark in commerce.

The Trademark Examining Attorney refused registration of Applicant's mark under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1), on the ground that the mark merely describes a website portal that "is intended to feature some level of diagnostic information." 6 TTABVUE 11.[2]

When the refusal was made final, Applicant appealed. Applicant and the Examining Attorney filed briefs, and Applicant filed a reply brief. An oral hearing was held on August 11, 2022. We affirm the refusal to register.

## I.  Preliminary Matter

Applicant objects to the Board's consideration of pages from Applicant's website that the Examining Attorney obtained from the Internet. Relying on these pages, the Examining Attorney concluded that "the applicant's website portal also features diagnostic information." 6 TTABVUE 10.

Material obtained from an applicant's website is generally acceptable as competent evidence. "[T]he United States Patent and Trademark Office ('USPTO') commonly looks to an applicant's website when it is made of record for possible evidence of descriptive use of a proposed mark." *In re Berkeley Lights, Inc.*, 2022 USPQ2d 1000, at *9 (TTAB 2022); *see also In re N.C. Lottery*, 866 F.3d 1363, 123 USPQ2d 1707, 1709-10 (Fed. Cir. 2017) ("This court has explained that the public's understanding of a mark can be evidenced by any competent source. These sources

---

[2] All citations in this opinion to the appeal record are to TTABVUE, the docket history system for the Trademark Trial and Appeal Board. Before the TTABVUE designation is the docket entry number; and after this designation are the page references, if applicable. Citations to the prosecution history of the application are to pages from the Trademark Status & Document Retrieval ("TSDR") database of the United States Patent and Trademark Office ("USPTO").

may include websites, publications, and use in labels, packages, or in advertising material directed to the goods.") (citations and internal quotation marks omitted); *In re Fallon*, 2020 USPQ2d 11249, at *10 (TTAB 2020) (finding text used on [applicant's] website "the most compelling evidence of the mere descriptiveness of Applicant's proposed mark as a whole"); *In re Promo Ink*, 78 USPQ2d 1301, 1302-03 (TTAB 2006) (examining attorney's introduction of portions of applicant's website is permissible in connection with refusal of examination of applicant's intent-to-use application as merely descriptive).

Applicant objects to the website pages on the ground that they are merely a mockup:

> It should be understood that the portal in question is currently under development, and its functionality--both current and anticipated-- are in flux. Initially, the portal was intended to store *some* diagnostic information such as radiology reports, and a mockup website was created with this in mind. The website that the examiner references in the rejection is, indeed, the mockup website. At the time of the last reply, however, the current embodiment of the portal did not include diagnostic information. (emphasis in original.)

May 17, 2021 Response at TSDR 3. Applicant contends the application was filed "as intent to use because the website was under development," 7 TTABVUE 4; that its intentions are mere "speculation," *id.*; and that "storing diagnostic information is not a function of the service[.]" 4 TTABVUE 4.

The webpages filed by the Examining Attorney were publicly available and are in the record. There is no indication on their face that the site was a "beta" site or still in testing. The allegedly different current version of Applicant's website, which

Applicant refers to in its brief as having been "launched," is, as Applicant concedes, "not in evidence." 4 TTABVUE 5. Although Applicant's attorney states that "the Examiner is relying on an outdated, mockup of the webpage that was never in use," 4 TTABVUE 4, Applicant has not submitted a declaration or affidavit of a fact witness in support of its contention. Applicant also has not filed a request for remand to submit, in place of the purported "mockup," an updated website that does not include reference to "diagnostic information" or "diagnosis." We have only Applicant's attorney's statements in Applicant's brief and its Office Action response upon which to base a finding that the webpages of record are not, in fact, in use on Applicant's website.

The persuasive value of Applicant's attorney's statements is undermined by the lack of corroboration from a knowledgeable fact witness and lack of a copy of the allegedly updated website. "Attorney argument is no substitute for evidence." *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1799 (Fed. Cir. 2018). The website was public-facing, as shown by the form request at the end of the website, designed for would-be users to leave their contact information should they wish to receive further information from Applicant. We thus consider the pages from Applicant's website filed by the Examining Attorney to be in the record.

Applicant suggests that it "makes sense" to remand the case, 4 TTABVUE 4, presumably to allow Applicant an opportunity to counter the probative value of the "mockup" website. Even if we construed Applicant's statements as requesting suspension and remand under Trademark Rule 2.142(d)(1); 37 C.F.R. § 2.142(d)(1),

the request would be denied. Applicant has not shown good cause for the request, nor has it accompanied the request by any corroborating evidence, such as an affidavit or declaration attesting to the website as being a "mockup," or a verified copy of pages from its current website, showing lack of reference to diagnoses or diagnostic information.[3] *See In re Adlon Brand Gmbh & Co.*, 120 USPQ2d 1717, 1725 (TTAB 2016) (denying request for remand in applicant's brief, and explaining that proper procedure "was to file with the Board, after the filing of the appeal but before briefing, a request for remand with a showing of good cause"); *In re Luxuria, s.r.o.*, 100 USPQ2d 1146, 1147 (TTAB 2011) ("in determining whether good cause has been shown, the Board will consider both the reason given and the point in the appeal at which the request for remand is made"); TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 1207.02 (2022) (request for remand "must include a showing of good cause therefor (which may take the form of a satisfactory explanation as to why the evidence was not filed prior to appeal), and be accompanied by the additional evidence sought to be introduced") and authorities cited in that section.

## II. Mere Descriptiveness – Applicable Law

Section 2(e)(1) of the Trademark Act prohibits registration on the Principal

---

[3] We note that the Examining Attorney first placed screenshots of Applicant's website in the record in connection with the first Office Action, dated Dec. 18, 2018, and informed Applicant that "applicant may provide written arguments *and evidence* against the refusal." (emphasis added). Applicant had ample time in prosecution to introduce evidence in rebuttal, such as evidence that might support its assertion that the site was only a mockup and not in use. We make no finding as to the effect an updated website that were properly in the record would have had, as to do so would be to engage in unnecessary speculation.

Register of a mark that, when used on or in connection with the applicant's goods or services, is merely descriptive of them. "A term is merely descriptive if it immediately conveys knowledge of a quality, feature, function, or characteristic of the goods or services with which it is used." *In re Chamber of Commerce of the U.S.*, 675 F.3d 1297, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012) (quoting *In re Bayer AG*, 488 F.3d 960, 82 USPQ2d 1828, 1831 (Fed. Cir. 2007)); *see also In re TriVita, Inc.*, 783 F.3d 872, 114 USPQ2d 1574, 1575 (Fed. Cir. 2015); *In re Gyulay*, 820 F.2d 1216, 3 USPQ2d 1009, 1009 (Fed. Cir. 1987).

Descriptiveness is not considered in the abstract; it is analyzed in relation to an applicant's identified goods or services, "the context in which the [term] is being used, and the possible significance that the term would have to the average purchaser of the [services] because of the manner of its use or intended use." *In re Bayer*, 82 USPQ2d at 1831. "For descriptiveness, '[t]he question is not whether someone presented with only the mark could guess what the goods or services are. Rather, the question is whether someone who knows what the goods and services are will understand the mark to convey information about them.'" *Earnhardt v. Kerry Earnhardt, Inc.*, 864 F.3d 1374, 123 USPQ2d 1411, 1413-14 (Fed. Cir. 2017) (quoting *In re Fallon*, 2020 USPQ2d 11249, at *7; *see also Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.*, 906 F.3d 965, 128 USPQ2d 1370, 1374 (Fed. Cir. 2018); *DuoProSS Meditech Corp. v. Inviro Medical Devices, Ltd.*, 695 F.3d 1247, 103 USPQ2d 1753, 1757 (Fed. Cir. 2012)). That a term may have other meanings in different contexts is not controlling on the question of descriptiveness. *In re RiseSmart Inc.*, 104 USPQ2d

1931, 1933 (TTAB 2012) (citing *In re Chopper Indus.*, 222 USPQ 258, 259 (TTAB 1984)); *In re Bright-Crest, Ltd.*, 204 USPQ 591, 593 (TTAB 1979).

When two or more merely descriptive terms are combined, the composite mark "is registrable only if the combination of terms creates a unitary mark with a non-descriptive meaning, or if the composite has a bizarre or incongruous meaning as applied to the goods or services." *In re Omniome, Inc.*, 2020 USPQ2d 3222, at *4 (TTAB 2019); *see also DuoProSS Meditech*, 103 USPQ2d at 1758-59 (SNAP SIMPLY SAFER merely descriptive of "medical devices, namely, cannulae; medical, hypodermic, aspiration and injection needles; medical, hypodermic, aspiration, and injection syringes"); *In re Tower Tech Inc.*, 64 USPQ2d 1314, 1316-17 (TTAB 2002) (SMARTTOWER merely descriptive of commercial and industrial cooling towers); *In re Sun Microsystems Inc.*, 59 USPQ2d 1084, 1088 (TTAB 2001) (AGENTBEANS merely descriptive of computer programs for use in development and deployment of application programs).

Applicant's combination of DX and PORTAL, without a space, does not sidestep this principle. *See In re ING Direct Bancorp*, 100 USPQ2d 1681, 1690 (TTAB 2011) (finding "Person2Person Payment" generic despite deletion of spaces); *Giersch v. Scripps Networks Inc.*, 90 USPQ2d 1020, 1025 (TTAB 2009) (finding that DESIGNED TO SELL does not create a distinct commercial impression from DESIGNED2SELL); *In re Cox Enters. Inc.*, 82 USPQ2d 1040, 1043 (TTAB 2007) ("THEATL is simply a compressed version of the descriptive term THE ATL without a space between the two words. Without the space, THEATL is equivalent in sound, meaning and

impression to THE ATL and is equally descriptive of applicant's goods"); *see also In re Omaha Nat'l Corp.*, 819 F.2d 1117, 2 USPQ2d 1859, 1860-61 (Fed. Cir. 1987) (affirming the Board's finding that FirsTier, the phonetic equivalent of "first tier," is merely descriptive of banking services and must be disclaimed).

The compound term DXPORTAL will be found merely descriptive if the individual components retain their descriptive meaning in relation to the services and the combination does not form a mark which has a distinct nondescriptive meaning of its own as a whole. *In re Oppedahl & Larson Llp,* 373 F.3d 1171, 71 USPQ2d 1370, 1372 (Fed. Cir. 2004) ("Thus, the PTO may properly consider the meaning of 'patents' and the meaning of '.com' with respect to the goods identified in the application. However, if those two portions individually are merely descriptive of an aspect of appellant's goods, the PTO must also determine whether the mark as a whole, i.e., the combination of the individual parts, conveys any distinctive source-identifying impression contrary to the descriptiveness of the individual parts."); *In re Fat Boys Water Sports LLC*, 118 USPQ2d 1511, 1516 (TTAB 2016) (citing *In re Tower Tech*, 64 USPQ2d at 1317-18). Applicant does not argue that the mark could be interpreted as a combination of any terms other than DX and PORTAL.

**III. Analysis**

DX is a common abbreviation for the word "diagnosis," meaning "the determination of the nature of a disease."[4] It also is used to mean "diagnostic."

---

[4] At www.medicinenet.com; May 7, 2020 Office Action, TSDR 2.

*See, e.g.*, webpage evidence from the website VisualDX using DX to refer to "an award-winning diagnostic clinical decisions support system."[5] Applicant does not dispute that DX would be perceived as meaning "diagnostic."

With respect to the term PORTAL, Applicant has identified its services as "an Internet website portal in the healthcare field to provide a patient and caregivers with the patient's drug prescription information." Use of a term in an application's recitation of services strongly suggests that the term is merely descriptive. *See In re Taylor & Francis (Publishers) Inc.*, 55 USPQ2d 1213, 1215 (TTAB 2000) (PSYCHOLOGY PRESS & design found merely descriptive of nonfiction books in the field of psychology, in part because the applicant's "identification of goods expressly states that the series of non-fiction books upon which applicant uses its mark are 'in the field of psychology.'"); *In re Johanna Farms, Inc.*, 222 USPQ 607, 609 (TTAB 1984) ("The term 'yogurt' is concededly the name of the goods. That fact is incontrovertible where, as here, the same term has been used in the identification of goods for which registration is sought.").

---

[5] At www.visualdx.com; May 7, 2020 Office Action, TSDR 3. We take judicial notice of the medical definitions of DX as "diagnosis" and "diagnostic" from the MERRIAM-WEBSTER DICTIONARY, corroborating the above online definitions (https://www.merriam-webster.com/dictionary/dx) (last accessed October 3, 2022). The Board may take judicial notice of dictionary definitions, including online dictionaries which exist in printed format or have fixed regular editions. *See In re Cordua Rests. LP*, 110 USPQ2d 1227, 1229 n.4 (TTAB 2014), *aff'd*, 823 F.3d 594, 118 USPQ2d 1632 (Fed. Cir. 2016); *In re CyberFinancial.Net Inc.*, 65 USPQ2d 1789, 1791 n.3 (TTAB 2002); *see also Hancock v. Am. Steel & Wire Co.*, 203 F.2d 737, 97 USPQ 330, 332 (CCPA 1953) ("The meaning of these two words is the crux of the case. Courts take judicial notice of the meaning of words, and the court may always refer to standard dictionaries or other recognized authorities to refresh its memory and understanding as to the common meaning of language.") (citations omitted).

The Examining Attorney submitted a definition from netlingo.com of the term PORTAL as "a Web site that serves as a starting point to other destinations or activities on the Web."[6] The Examining Attorney's evidence from netlingo.com defines the term in this industry to refer both to a web portal that acts as a starting point that links to other Internet destinations, and also to web portals that act as a home base, providing for the users' Internet needs in one location by gathering information from either external or internal webpages and bringing it to the user. *Id.* Applicant does both.

First, Applicant provides a link to other webpages. As advertised on Applicant's website, "[w]ithin DXPortal, patient's [sic] can keep track of current prescriptions, prescription history, allergies, and diagnoses. They can set medication reminders and customize a health and wellness feed using information from third-party websites like WebMD, PDR, the Heart Association, etc." December 18, 2018 Office Action, TSDR 10. Secondly, Applicant's DXPORTAL website collects a person's health information and brings it into the DXPORTAL website. The website advertises, "[o]nce the patient signs up with DxPortal, much of the health information residing in their DxScript account . . . will be passed securely to your patient's DxPortal account . . . ." *Id.*[7]

---

[6] December 18, 2018 Office Action, TSDR 13.

[7] This is consistent with the manner in which several of the third-party websites of record gather data from other locations and consolidate them into a single access point *See, e.g.,* June 14, 2021 Office Action, TSDR 6 (page from GenesisDx.com/client-access-portal/). For example, GenesisDx has three different portals. The provider portal gives complete access to patient medical history; the sales portal gives information on monthly collection, payer mix, and sample volume; and the reference lab portal gives medical tests at their laboratories.

Applicant does not argue that PORTAL is not merely descriptive of its services and, indeed, seems implicitly to concede it is. 4 TTABVUE 5 ("The portal is intended to be a secure place for people/patients to keep important digital information . . . and other digital documents requiring a secure storage.").

The Examining Attorney also points to statements made by Applicant in its May 17, 2021 Response at TSDR 2-3 that reflect Applicant's intention to provide a website portal for keeping track of diagnostic information:

> It should be understood, however, that, recently, after the passing of the Care Act 2021 and the requirement that diagnostic information must be provided to patients online, there is a renewed focus on providing diagnostic information (e.g. radiology reports) on the portal. Therefore, although it might appear Applicant's position is changing again, the intent is to store *some* diagnostic information to the subject portal.

Applicant argues that although it "does intend (in the future) to include limited diagnostic information on the portal, the storing of diagnostic information on the portal is not the focus of the portal, nor is it recited in the description of services of the mark." May 17, 2021 Response to Office Action, TSDR 3-4.

Even if storing diagnostic information is only one of a number of features provided by Applicant's services, "[a] mark need not recite each feature of the relevant goods or services in detail to be descriptive, it need only describe a single feature or attribute." *In re Chamber of Commerce of the U.S.,* 675 F.3d 1297, 102 USPQ2d 1217,

---

None of these portals provide external links for searching. They provide a single access point for information on medical history, sales information, and medical testing.

1219 (Fed. Cir. 2012) (citation and internal quotation marks omitted) ("To decide this case, we need only find that NATIONAL CHAMBER immediately conveys information about one feature or characteristic of at least one of the designated services"); *see also In re Oppedahl & Larson LLP*, 373 F.3d 1171, 71 USPQ2d 1370, 1371 (Fed. Cir. 2004) (a proposed mark "may be merely descriptive even if it does not describe the 'full scope and extent' of the applicant's [services]… .") (citing *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 57 USPQ2d 1807, 1812 (Fed. Cir. 2001)). Thus, the fact that storing diagnostic information appears to be only one of a number of features provided by Applicant's services does not obviate the refusal.

Although Applicant's recitation of services initially was broad enough to cover a website portal providing diagnostic information, the final recital of services specifically limits Applicant's website portal services to providing "a patient and caregivers with the patient's drug prescription information." Nonetheless, as the Court of Appeals for the Federal Circuit explained (in the context of determining the meaning of an applicant's "information exchange about legal services" for purposes of establishing the genus for a genericness refusal), while the Board may not "define the genus of covered services by directly (and improperly) incorporating non-claimed services," we may consider how an applicant describes its services on its website "for context, to inform [our] understanding of the term[s]." *In re Reed Elsevier Props. Inc.*, 482 F.3d 1376, 82 USPQ2d 1378, 1380 (Fed. Cir. 2007) (citing *In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1423 (Fed. Cir. 2005) (it is appropriate for the Board to consider the applicant's website to understand the meaning of the services for

which registration is sought)); *see also In re Water Gremlin Co.*, 635 F.2d 841, 208 USPQ 89, 91-92 (CCPA 1980) (in affirming a finding that SINKER SELECTOR was merely descriptive, the court said, "Appellant apparently sought to avoid particularizing its goods in order to make the argument that the word 'SELECTOR' is arbitrary with respect to fishing weights. We find this argument … specious… .") (citation omitted); *In re DNI Holdings Ltd.*, 77 USPQ2d 1435, 1438 (TTAB 2005) (finding that "despite applicant's tactical decision to carve [sports betting services] out of its recitation of services, we find that the relevant genus of services herein includes wagering on sporting events.").

As the Federal Circuit clarified in *Reed Elsevier*:

> In determining the meaning of "information exchange about legal services" as defined by Reed's application, the board appropriately reviewed the *www.lawyers.com* website for context, to inform its understanding of the term. (internal citation omitted). It did not, as Reed contends, define the genus of covered services by directly (and improperly) incorporating non-claimed services, also present on Reed's website, into the scope of the genus that it defined. In fact, looking to Reed's website makes clear that an integral, if not the paramount, aspect of "information exchange about legal services" as Reed defines it concerns identifying and helping people to select lawyers. This is amply demonstrated by the ubiquitous nature of the "search for lawyers" and "find a lawyer" functions both on web pages providing information about legal services generally and on pages providing information about specific legal practice areas.

82 USPQ2d at 1380; *see also Water Gremlin*, 208 USPQ at 92 ("How the mark is used in the marketplace and what it means to the public are the appropriate considerations, not a technicality of what language appears in an application."); *Berkeley Lights*, 2022 USPQ2d 1000, at *12 (where there is record evidence of the

applicant's use of the proposed mark, the Board "must consider [the] mark in its commercial context to determine the public's perception.") (quoting *In re N.C. Lottery*, 866 F.3d 1363, 123 USPQ2d 1707, 1709 (Fed. Cir. 2017)).

We find *Water Gremlin* and *Reed Elsevier* applicable here. Providing diagnostic information as a service is "amply demonstrated" as an integral part of Applicant's website relating to drug prescriptions, even if such diagnostic information is not the paramount aspect. *See, e.g.*, Dec. 18, 2018 Office Action at TSDR 10 (copy of Applicant's webpage stating "[w]ithin DxPortal, patient's [sic] can keep track of current prescriptions, prescription history, allergies, and diagnoses.").. Diagnostic information necessarily is tied to prescriptions, which treat the conditions that are diagnosed.

In addition, the Examining Attorney submitted copies of pages from third-party websites to illustrate how diagnostic information and therapeutic solutions, such as prescription drugs, are integral to each other. Four representative websites are listed below.[8]

- **VisualDx** is "an award-winning diagnostic clinical decision support system designed to enhance diagnostic accuracy, aid therapeutic decisions, and improve patient safety." May 7, 2022 Office Action, TSDR 3.

---

[8] We take judicial notice that COLLINS DICTIONARY defines the term "therapeutic" as an adjective meaning "of or pertaining to the treating or curing of disease; curative" and as a noun meaning "a therapeutic substance." (https://www.collinsdictionary.com/us/dictionary/english/therapeutic) (accessed Oct. 26, 2022). Prescription drugs fall within the meaning of "therapeutic substances."



- **UDX Ultimate DX**, a "licensed state-of-the-art laboratory," allows "physicians and health care professionals to test a wide range of medical issues including infectious disease, drug resistance, oncology, pharmacology, clinical chemistry, and pharmacogenetics."[9] "Our dedicated team of scientists and experts help healthcare providers utilize the most advanced molecular technology to provide the best possible tools for accurate diagnoses and treatment." June 14, 2021 Office Action, TSDR 4.[10]

- **AccessDx Redefining Personalized Therapy** advertises "Diagnostic Solutions" and "other advanced personalized solutions to empower clinical decision support within existing care work flows." Healthcare providers "depend on our team of laboratories, scientists,

---

[9] We also take judicial notice that "pharmacology" is defined as "the branch of science relating to drugs and medicines." COLLINS DICTIONARY (https://www.collinsdictionary.com/us/dictionary/english/pharmacology) (accessed Nov. 4, 2022).

[10] The MERRIAM-WEBSTER DICTIONARY defines "treatment" as "a therapeutic agent, therapy, or procedure used to treat a medical condition." (https://www.merriam-webster.com/dictionary/treatment) (last accessed Nov. 4, 2022). We take judicial notice of this dictionary definition as well.

and software engineers to assist them with improving patient care." "We deliver expertise in . . . clinical and pharmacy decisions support [and] technical and clinical workflow integration." June 14, 2021 Office Action, TSDR 8.





- **HALO Diagnostics** advertises several types of screening solutions designed to provide patients with detailed information and personalized tests. "To get the care and treatment that is right for you, you and your doctor need a clear and detailed picture of your overall health." "We believe that more knowledge means more power when it comes to making decisions about your care and treatment." June 14, 2021 Office Action, TSDR 9-11.



Sponsors of the third-party websites submitted by the Examining Attorney provide physicians and other health care providers with information for treating their patients, and (as with the HALO website) with diagnostic information enabling the general consumer to obtain "the care and treatment that is right for you."[11] The webpages show an inherent relationship between diagnostic services

---

[11] At halodx.com; June 14, 2021 Office Action, TSDR 10.

and treatment, which could include prescribing drugs to address a condition. Moreover, "drug prescription information" is broad enough to include the diagnostic information on which a prescription is based.

Based on the dictionary definitions of "DX" and "PORTAL," the information on Applicant's website and the third-party websites, and the acknowledgment by Applicant that it does intend to offer diagnostic services in connection with the mark, we find that when prospective consumers encounter the term DXPORTAL associated with a website portal providing drug prescription information, they will immediately understand that it identifies a portal that will also link them with diagnostic information, specifically the diagnosis relied upon by the healthcare provider who wrote the drug prescription. DXPORTAL as a whole conveys no more than the sum of its individually descriptive parts. Accordingly, we find that the mark is merely descriptive of Applicant's services.

**Decision:** The refusal to register Applicant's mark DXPORTAL on the Principal Register under Section 2(e)(1) of the Trademark Act is affirmed.